## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**TIMOTHY WALTER,**

     Plaintiff,

                                 CASE NO.

**v.**

                                 **JURY DEMAND**

**OAKLAND COMMUNITY COLLEGE,**

     Defendant.

_____/

**MICHAEL N. HANNA (P81462)**
**HABA K. YONO (P81114)**
**MORGAN & MORGAN, P.A.**
Attorney for Plaintiff
2000 Town Center
Suite 1900
Southfield, MI  48075
Telephone: (313) 251-1399
mhanna@forthepeople.com
hyono@forthepeople.com
_____

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Timothy Walter ("Dr. Walter"), brings this Complaint for damages and demand for jury trial against Defendant, Oakland Community College, ("OCC"), and states as follows:

### PARTIES

1.    Plaintiff, Timothy Walter, is a resident of the State of Michigan and resides in Washtenaw County, Michigan.

2.      Defendant, Oakland Community College, is a public education institution with multiple campuses in Oakland County, Michigan, with its principal place of business in Bloomfield Hills, Michigan.

3.      The events described in this lawsuit primarily occurred in Oakland County, Michigan.

4.      At all times material hereto, Plaintiff was an "employee" of Defendant within the meaning of the Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 701 *et seq.*, Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*, and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), MCL §37.1101 *et seq.*

5.      At all times material hereto, Plaintiff was a "public employee" of Defendant within the meaning of the Public Employment Relations Act ("PERA"), MCL § 423.201 *et seq.*

6.      At all times material hereto, Defendant is an "employer" covered under Section 504, ADA, and PWDCRA.

7.      At all times material hereto, Defendant is a state covered employer under 42 U.S.C. § 1983.

8.      Defendant is a "program or activity" as defined by the Rehabilitation Act, i.e., "a college, university, or other postsecondary institution." 29 U.S.C.A. § 794(b)(2)(A).

2

9.   Defendant receives Federal financial assistance through student loans, federal grants, and Pell Grants. By doing so, Defendant has waived immunity under the Rehabilitation Act.

10.   At all times material hereto, the student was an individual with a "disability" as that term is defined by 42 U.S.C § 12101(1), 29 U.S.C. § 705(9), and MCL §37.1103 (d) & (h).

## JURISDICTION

11.   The jurisdiction of this court is invoked pursuant to Title I of the ADA, Section 504, and 42 U.S.C. § 1983. As such, the Court has original jurisdiction over this complaint pursuant to 28 U.S.C. §§ 1331 and 1337.

12.   The Court has supplemental jurisdiction of Plaintiff's PWDCRA and PERA claims pursuant to 28 U.S.C. § 1367 as these claims are so related to Plaintiff's ADA, Section 504, and 42 U.S.C. § 1983 claims that they form part of the same case or controversy.

13.   Jurisdiction to grant injunctive and declaratory equitable relief as well as damages is invoked pursuant to the Acts cited above as well as *Ex Parte Young*, 209 U.S. 123 (1908) pursuant to Plaintiff's request for prospective injunctive relief.

## VENUE

14.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred within the Southern Division of the Eastern District of Michigan.

15.     Defendant conducts substantial and not isolated business within the Southern Division of the Eastern District of Michigan.

16.      Defendant has agents and employees in the Southern Division of the Eastern District of Michigan, and Defendant's Business is located within Oakland County.

## CONDITIONS PRECEDENT

17.     Plaintiff has exhausted his administrative remedies by filing a charge of discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC) on October 18, 2018.

18.     On November 19, 2018, the EEOC issued Plaintiff a Dismissal and Notice of Right to Sue against Defendant with regard to this matter.

19.     On February 1, 2019, the parties entered into a tolling agreement, and later amended the tolling agreement to extend the tolling period and provide the tolling period shall terminate on April 15, 2019.

20.     Plaintiff files this action within the applicable period of limitations.

21.   All conditions precedent to this action have been satisfied and/or waived.

## STATEMENT OF FACTS

22.   OCC is a community college.

23.   Dr. Walter began his employment with OCC in approximately July1997.

24.   Dr. Walter was represented by Teamsters Local Union 214 ("Union").

25.   The Union entered into a collective bargaining agreement with OCC, governing Dr. Walter's employment.

26.   The agreement provided that Dr. Walter "will not be disciplined or discharged without just cause."

27.   Dr. Walter served as the Dean of Student Services for OCC.

28.   Dr. Walter's duties included advocating for students.

29.   Dr. Walter also served as the head of the Behavioral Assessment Response Team ("BART") committee, which was responsible for enforcing the Student Code of Conduct and the Student Grade Appeals.

30.   OCC's behavior assessment program is responsible for gathering information concerning potential threats, using resources to manage potential threats, and bringing threats to an appropriate conclusion with safety and

individual rights considered.

31.    Safety is the primary goal of the behavior assessment program, which is set up in part to manage the increasing signs of stress in the collegiate setting.

32.    On or about February 1, 2018, Dr. Walter received an email that a student advised OCC's Public Safety Office that his roommate, also an OCC student, was suicidal.

33.    OCC's Public Safety officer and the Waterford Police Department encouraged the student to meet them on campus after he threatened to commit suicide, at which point the student was subject to a traffic stop by the Waterford Police Department before he could enter the campus.

34.    The Waterford Police Department stopped the student, and took him to Common Ground Resource and Crisis Center.

35.    During the stop, a knife and ammunition were found in the trunk of the student's vehicle.

36.    However, the student did not have guns on his person or in his vehicle.

37.    OCC's Public Safety officer advised the student that he was prohibited from returning to campus until he was cleared to return.

38.    OCC's Public Safety officers are responsible for issuing weapons

violations.

39.    OCC's Public Safety officer did not issue the student a weapons violation because the student did not bring weapons to campus.

40.    Dr. Walter prohibited the student from returning to campus because his actions were in violation of the Student Code of Conduct as his behavior suggested that he was at risk of harm to himself or others.

41.    This action effectively suspended the student from entering OCC campus indefinitely.

42.    The suicidal student was then checked into the Battle Creek Veterans Affairs ("VA") Hospital.

43.    The student was a veteran of the U.S. Marines, and suffered from aggravated depression and suicidal ideations.

44.    On February 2, 2018, Dr. Walter informed the other members of the BART committee of the incident.

45.    On February 4, 2018, Dr. Walter received a call from the student while he was at the hospital.

46.    During this call, Dr. Walter again advised the student that he was suspended.

47.    Dr. Walter also advised the student that he could not return to campus without notifying public safety officers first and instructed the student to

contact him when he was released from the hospital.

48.     On or about February 5, 2018, the student called Dr. Walter again.

49.     During that call, the student indicated that he wanted to continue at OCC and would take the necessary steps in order to return to OCC.

50.     Dr. Walter again advised the student to notify public safety officers before returning to campus.

51.     On or about February 6, 2018, the student again called Dr. Walter and indicated that he wanted to meet with the BART committee regarding his return to OCC.

52.     Thereafter, the BART committee met with the student regarding his status at OCC on two occasions.

53.     During the second BART meeting with the student present, OCC's VA Benefits Specialist, Jennifer Clifton, explained to the student that if he were withdrawn from OCC, he would lose all VA benefits but if he received incompletes, he would maintain his VA benefits.

54.     The student made clear to the BART committee that it would be very traumatic for him to lose his VA benefits.

55.     At the meeting, Dr. Walter advised the student that he had no control over the issuance of "incompletes," and that this would be left to the discretion of the instructors but agreed to advocate for the student and submit a request for

8

medical accommodation on the student's behalf based on the student's disability.

56.    At the end of the meeting, the student was again reminded that he was suspended from OCC until further notice.

57.    An OCC's Public Safety officer opined that the student should not be allowed back on any OCC property until sufficient time and appropriate care has been met, and the student was cleared to return.

58.    The BART committee was provided with the V.A. Hospital's conclusion that he was not a threat to himself or to others.

59.    OCC's counselling faculty member and BART Committee members, Drs. Renee Henson and Nicole Kassab, requested that Dr. Walter advise the student's teachers that the student is on medical leave and request that they not withdraw him from his classes or assign him any grades to avoid the student from being penalized in regard to his VA benefits, which will prevent him from receiving the medical care that he needs.

60.    In response, Dr. Walter advocated for the student based on his medical condition, advised the student's teachers that the student is out for medical reasons, and made a reasonable request for accommodation on behalf of the student that an incomplete mark be issued due to medical reasons.

61.    OCC's grading policy provides that incomplete marks are permitted in emergency situations that prevent a student from completing course work

during the regular college session.

62. Incompletes are routinely granted for a number of reasons, including a death in the family, serious illness, and other personal reasons.

63. Incomplete grades would allow the student one year to make up his coursework and may allow the student to maintain his VA benefits until his suspension was lifted.

64. Dr. Walter and the BART committee believed that the student losing his benefits would escalate the situation and possibly cause greater danger to the student and student body at OCC, including the potential of dealing with an active shooter scenario, and came to the conclusion that the best course of action was to advocate for the issuance of incomplete marks for the student as to allow him to obtain the appropriate psychological and medical help from the V.A. while avoiding potential harm to the student and campus in general. Accordingly, Dr. Walter's advocacy was on behalf of the student, as well as on behalf of OCC's student body as a whole.

65. The issuance of incomplete grades would have no effect on the student's suspension.

66. The decision to issue incomplete marks was up to the student's instructors.

67. On February 19, 2018, Robin Tennyson, a steward from the Oakland

Community College Faculty Association, indicated to Dr. Walter that some faculty members had concerns regarding the issuance of incompletes.

68.    Dr. Walter explained to Ms. Tennyson that he asked the professors to consider issuing incompletes based on his medical condition, which would also allow the student to obtain the necessary psychological and medical help.

69.    Ms. Tennyson advised that there was a general assumption of issuing incompletes at the end of the semester, but it was in the faculty members' judgment to issue an incomplete earlier in the semester under compelling circumstances.

70.    On February 20, 2018, the student met with the BART committee.

71.    The BART committee advised the student that he was still suspended.

72.    The student reaffirmed to the BART committee his suicidal ideations.

73.    On or about February 28, 2018, Dr. Lori Przymusinski, Interim Vice Chancellor of Student Services, met with the BART committee to review the BART process.

74.    After meeting with Dr. Przymusinski, Dr. Walter was asked to meet with Human Resources.

75.    Dr. Walter attended the meeting with his union representative, Doug

11

Kolly.

76.     Attorneys Maria Dwyer and Robert Dare were at this meeting, and they both conducted an interview as to the BART process regarding the student.

77.     After this meeting, Dr. Walter received a call from Eileen Husband, OCC Vice Chancellor of Legal Services, requesting further explanations on questions the BART committee answered.

78.     Unbeknownst to Dr. Walter, as he was speaking to Ms. Husband, Dr. Przymusinski and Dr. Cathy Maize, the Vice Chancellor for Academic Affairs, were also on the call.

79.     As Dr. Walter was speaking to Ms. Husband, Dr. Przymusinski and Dr. Maize began yelling at Dr. Walter.

80.     Dr. Maize yelled at Dr. Walter as to the request for issuance of incompletes, and otherwise for his advocacy on behalf of a disabled student.

81.     Dr. Walter explained that the option of issuing incompletes was left to the discretion of the student's instructors and that he, along with the BART committee, believed issuing withdrawals instead of incompletes would have created a greater threat to the student and to OCC.

82.     Dr. Walter reaffirmed his advocacy, and advised Defendant that it was the BART committee's position that the best course of action would be to keep the student off campus while he received psychological and medical help

12

from the VA.

83.  During this call, Dr. Przymusinski also yelled at Dr. Walter, alleged that he failed to inform her of this situation, and advised that he would be precluded from conducting any further BART investigations.

84.  It was not Dr. Walter's duty to update Dr. Pryzmusinski on pending BART matters.

85.  Nevertheless, Dr. Walter attempted to contact Dr. Przymusinski on two separate occasions concerning this matter, to no avail.

86.  Dr. Walter objected to Dr. Przymusinski and Dr. Maize's retaliatory harassment because he advocated for a disabled student.

87.  Dr. Walter lodged a formal complaint of harassment against Dr. Przymusinski and Dr. Maize's based on their retaliation and the retaliatory hostile work environment he was made to endure as a result of his advocacy on behalf of a disabled student.

88.  On March 6, 2018, OCC placed Dr. Walter on administrative leave because of his "handling of the behavioral assessment of" the student.

89.  The BART committee does not issue written suspensions until a final determination is made, and the BART committee did not make the final decision on the student's case until after Dr. Walter was placed on administrative leave.

90.     OCC denied the medical accommodation Dr. Walter advocated for.

91.     On April 23, 2018, OCC retaliated against Dr. Walter based on his request for medical accommodation and advocacy for a disabled student, and terminated Dr. Walter's employment.

92.     The Union disputed Dr. Walter's termination on his behalf, and claimed inadequate reasons were provided as to his termination.

93.     Upon information and belief, OCC informed the Union that its decision was final and the Union could pursue arbitration.

94.     Mark Gaffney, the Union Representative, advised Dr. Walter that he could either arbitrate or litigate his claims.

95.     Mr. Gaffney advised Dr. Walter not to pursue arbitration as he believed the arbitration panel was biased in favor of the employer, and the arbitration decision would be final and binding.

96.     Based on this advice, Dr. Walter did not pursue arbitration.

97.     Dr. Walter retained the law firm of MORGAN & MORGAN, P.A. to represent him in the litigation.

## COUNT I
## RETALIATION FOR EXERCISING RIGHTS UNDER
## THE REHABILITATION ACT

98.     Plaintiff realleges and reincorporates paragraphs 1-97 as if fully set forth herein.

14

99.     Plaintiff engaged in protected activity by opposing acts and practices made unlawful by the Rehabilitation Act including, but not limited to, failing to accommodate the student's disability, objecting to discrimination based on the student's disability, requesting accommodations based on the student's disability, withdrawing previous accommodation(s) for the student's disability, subjecting Plaintiff to disparate treatment, harassment, retaliatory hostile work environment and/or discrimination, and/or objecting to the disparate treatment, harassment, and/or discrimination Plaintiff received  on the basis of his protected acts, as set forth herein.

100.    Defendant's retaliatory acts and omissions occurred, at least in part, because of Plaintiff's advocacy on behalf of the student with the disability and attempting to protect the rights of the student.

101.    Defendant retaliated and discriminated against Plaintiff for engaging in said protected activity.

102.    During the time Plaintiff was employed by Defendant, he exercised and/or enjoyed rights granted and/or protected by the Rehabilitation Act, including, but not limited to, opposing acts and practices made unlawful by the Rehabilitation Act.

103.    Defendant coerced, intimated, and/or threatened Plaintiff on account of his having exercised and/or enjoyed rights granted and/or protected by the

Rehabilitation Act.

104.   Defendant interfered with Plaintiff in the exercise and/or enjoyment of rights granted and/or protected by the Rehabilitation Act.

105.   Defendant terminated Plaintiff's employment after he exercised a right afforded under the Rehabilitation Act.

106.   Under the Rehabilitation Act, Defendant was legally obligated to refrain from retaliating against Plaintiff because of his objection to illegal discrimination based on the student's disability and his advocacy on behalf of the student.

107.   Notwithstanding this obligation under the Rehabilitation Act and in willful violation thereof, Defendant retaliated against Plaintiff because he objected to illegal discrimination based on the student's disability and advocated for same.

108.   As a direct and proximate result of Defendant's retaliation, interference, coercion and/or intimidation in violation of the Rehabilitation Act, Plaintiff has suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

109.   As a further direct and proximate result of Defendant's retaliation, interference, coercion and/or intimidation in violation of the Rehabilitation Act,

Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, a loss and impairment of his earning capacity and ability to work, and will so suffer in the future; he has also been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

**COUNT II**
**RETALIATION FOR EXERCISING RIGHTS UNDER THE ADA**

110.    Plaintiff realleges and reincorporates paragraphs 1-97 as if fully set forth herein.

111.    Plaintiff engaged in protected activity by opposing acts and practices made unlawful by the ADA including, but not limited to advocating on behalf of a student with a disability, requesting an accommodation on behalf of a student based on a student's disability, and objecting to discrimination based on his advocacy for a student with a disability.

112.    Defendant retaliated against Plaintiff, and subjected him to disparate treatment, harassment, and/or discrimination on the basis of his protected activity, as set forth herein.

113.    Defendant's retaliatory acts and omissions occurred, at least in part, because of Plaintiff's advocacy on behalf of the disabled student, attempting to protect the rights of the student, and objection to retaliatory harassment based on

advocacy on behalf of a disabled student.

114.    During the time Plaintiff was employed by Defendant, he exercised and/or enjoyed rights granted and/or protected by the ADA, including, but not limited to, opposing acts and practices made unlawful by the ADA.

115.    Defendant coerced, intimated, and/or threatened Plaintiff on account of his having exercised and/or enjoyed rights granted and/or protected by the ADA.

116.    Defendant interfered with Plaintiff in the exercise and/or enjoyment of rights granted and/or protected by the ADA.

117.    Defendant terminated Plaintiff's employment after he exercised a right afforded under ADA.

118.    Under the ADA, Defendant was legally obligated to refrain from retaliating against Plaintiff because of his advocacy on behalf of a student with a disability, and also because he objected to harassment in response to his advocacy on behalf of a student with a disability.

119.    Notwithstanding this obligation under the ADA and in willful violation thereof, Defendant retaliated against Plaintiff because he advocated on behalf of a student with a disability, and objected to retaliatory harassment based on his advocacy on behalf of a student with a disability.

120.    As a direct and proximate result of Defendant's retaliation,

interference, coercion and/or intimidation in violation of the ADA, Plaintiff has suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

121.   As a further direct and proximate result of Defendant's retaliation, interference, coercion and/or intimidation in violation of the ADA, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, a loss and impairment of his earning capacity and ability to work, and will so suffer in the future; he has been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

## COUNT III
## RETALIATION FOR EXERCISING RIGHTS UNDER PWDCRA

122.   Plaintiff realleges and reincorporates paragraphs 1-97 as if fully set forth herein.

123.   Plaintiff engaged in protected activity by opposing acts and practices made unlawful by the PWDCRA including, but not limited to, advocacy on behalf of a student with a disability, request for accommodation on behalf of a student with a disability, objecting to retaliatory harassment because of his advocacy on behalf of a student with a disability, and otherwise subjecting Plaintiff to disparate treatment, harassment, and/or discrimination, and/or

objecting to the disparate treatment, harassment, and/or discrimination Plaintiff received on the basis of his protected acts, as set forth herein.

124. Defendant's retaliatory acts and omissions occurred, at least in part, because of Plaintiff's advocacy on behalf of the disabled student and attempting to protect the rights of the student.

125. Defendant retaliated and discriminated against Plaintiff for engaging in said protected activity.

126. During the time Plaintiff was employed by Defendant, he exercised and/or enjoyed rights granted and/or protected by the PWDCRA, including, but not limited to, objections to Defendant's practices made unlawful under PWDCRA, as set forth herein.

127. Defendant coerced, intimated, and/or threatened Plaintiff on account of his having exercised and/or enjoyed rights granted and/or protected by the PWDCRA.

128. Defendant interfered with Plaintiff in the exercise and/or enjoyment of rights granted and/or protected by the PWDCRA.

129. Defendant terminated Plaintiff's employment after he exercised a right afforded under PWDCRA.

130. Under PWDCRA, Defendant was legally obligated to refrain from retaliating against Plaintiff because he engaged in protective activity.

131.   Notwithstanding this obligation under the PWDCRA and in willful violation thereof, Defendant retaliated against Plaintiff because he advocated on behalf of a student with a disability, and objected to harassment because he advocated on behalf of a student with a disability.

132.   As a direct and proximate result of Defendant's retaliation, interference, coercion and/or intimidation in violation of the PWDCRA, Plaintiff has suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

133.   As a further direct and proximate result of Defendant's retaliation, interference, coercion and/or intimidation in violation of the PWDCRA, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, a loss and impairment of his earning capacity and ability to work, and will so suffer in the future; he has been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

**COUNT IV**
**VIOLATION OF 42 U.S.C. § 1983**

134.   Plaintiff realleges and reincorporates paragraphs 1-97 as if fully set forth herein.

135.   Plaintiff enjoyed a constitutionally protected property interest in

21

continued employment.

136.   Defendant terminated Plaintiff's employment without prior notice.

137.   Under the Fourteenth Amendment of the United States Constitution, Defendant was obligated to provide Plaintiff a pre-termination hearing or otherwise afford Plaintiff notice of the grounds for his termination or a meaningful opportunity to respond and a post-termination hearing before a neutral decision-maker.

138.   Defendant's actions in depriving Plaintiff of his constitutionally protected property interest in continued employment absent a pre-termination hearing or other notice of the grounds for his termination, an opportunity to respond, and a post-termination hearing abridged his right to due process of law in violation of the Fourteenth Amendment.

139.   As a direct and proximate result of Defendant's violation of Plaintiff's due process right under the Fourteenth Amendment, Plaintiff has suffered–emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

140.   As a further direct and proximate result of Defendant's violation of Plaintiff's due process right under the Fourteenth Amendment, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, a loss

and impairment of his earning capacity and ability to work, and will so suffer in the future; he has also been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

**COUNT V**
**BREACH OF THE COLLECTIVE BARGAINING AGREEMENT**

141.   Plaintiff realleges and reincorporates paragraphs 1-97 as if fully set forth herein.

142.   Defendant breached Article 14 of the collective bargaining agreement by disciplining and terminating Plaintiff's employment without just cause.

143.   Defendant's cause for discipline and termination were inadequate for just cause and contrary to the collective bargaining agreement.

144.   The Union breached its duty of fair representation by acting in an arbitrary, discriminatory and/or bad faith manner in failing to pursue and/or represent Plaintiff in his grievance and/or arbitration proceeding, and/or providing Plaintiff improper advice that forfeited his opportunity to pursue arbitration.

145.   As a result of Defendant's breach of contract, Plaintiff has suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and

will so suffer in the future.

146.   As a further direct and proximate result of Defendant's breach of contract, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, a loss and impairment of his earning capacity and ability to work, and will so suffer in the future; he has been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor against OCC and prays for damages in an amount to be determined at trial, together with interest, cost of suit, attorneys' fees, and all such other relief as the court deems just and proper which include:

a.   Declare that the aforementioned practices and actions of Defendant constitute unlawful employment practices in violation of Section 504, ADA, PWDCRA, 42 U.S.C. § 1983, and PERA;

b.   Award Plaintiff all lost wages, past and future, and other monetary damages to which he is entitled to including interest;

c.   Award Plaintiff compensatory, punitive, liquidated, and exemplary damages;

d.   Award Plaintiff reasonable attorney's fees, costs, and interest;

e.    Award Plaintiff equitable relief including, but not limited to: an injunction directing Defendant to cease their discriminatory conduct and practices; full reinstatement of his employment and position with Defendant; and injunctive relief directing Defendant to provide Plaintiff his requested reasonable accommodations within a reasonable time; and

f.    Award such other relief as this Court deems just and proper and any other relief afforded under Section 504, ADA, PWDCRA, 42 U.S.C. § 1983, and PERA.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.


Dated this 15th Day of April, 2019.


By: */s/ Michael N. Hanna*
    Michael N. Hanna, Esq.
    Michigan Bar. No P81462
    Morgan & Morgan, P.A.
    2000 Town Center
    Suite 1900
    Southfield , MI 48075
    Telephone:  (313) 739-1950
    Facsimile:   (313) 739-1975
    Email:       MHanna@forthepeople.com

    *Attorney for Plaintiff*