UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY L. WALTER,

        Plaintiff,                                    Case No. 19-11095

vs.                                            HON. MARK A. GOLDSMITH

OAKLAND COMMUNITY COLLEGE,

        Defendant.

_____/

**OPINION & ORDER
DENYING MOTION FOR PROTECTIVE ORDER PREVENTING CONTACT
WITH NON-PARTY WITNESS (Dkt. 41), AND DENYING MOTION FOR
PROTECTIVE ORDER PRECLUDING EILEEN HUSBAND'S DEPOSITION
(Dkt. 48)**

This matter is before the Court on Defendant Oakland Community College's ("OCC") motion for a protective order preventing any contact with a non-party witness (Dkt. 41) ("No Contact Motion") and OCC's motion for a protective order precluding Eileen Husband's deposition (Dkt. 48) ("No Deposition Motion"). Plaintiff Timothy Walter has responded to both motions (Dkts. 50, 55), and OCC has filed a reply brief in support of the motion to preclude Eileen Husband's deposition (Dkt. 58). For the reasons discussed below, the motions are denied.

        **I.        BACKGROUND**

Walter, former Dean of Students for OCC, brought this action against his former employer, alleging that OCC terminated his employment in violation of the Rehabilitation Act, the Americans with Disabilities Act ("ADA"), Michigan's People with Disabilities Civil Rights Act, the Fourteenth Amendment, and his collective bargaining agreement. Compl. (Dkt. 1). OCC has asserted that it terminated Walter for failing to perform his duties in reviewing a direct threat incident in which a student brought weapons onto the OCC campus. No Contact Mot. ¶ 1. OCC expelled the student for

violating its weapons policy. Id. ¶ 7. It now seeks to prevent Walter from contacting or deposing the former student on the belief that any such contact may provoke the former student, presenting a direct threat to OCC students of a potential shooter. Id. ¶ 11. Walter says that the former student had expressed a desire to kill himself, but that he never posed a threat to anyone else. Resp. at 17.

Although the parties appear to differ on a number of issues, the following facts do not appear to be in dispute. In February 2018, OCC's public safety office learned that an OCC student with a military background had threatened suicide. An OCC public safety officer spoke with the student and encouraged him to come to the public safety office on the OCC campus. Case Report, Ex. 1 to No Contact Mot., at PageID.454. When the student came to campus, local police officers stopped his vehicle and took him into custody. No Contact Mot. at 2. In the student's vehicle, the police officers found ammunition, a knife, used shooting targets, and a notebook containing some type of "military" strategies. Id. ¶ 2. A later search of the student's apartment turned up some firearms, some knives, and a bulletproof vest. Id. ¶ 3. The police officers transferred the student to Common Ground Resource & Crisis Center. Case Report at 10. He was later admitted to the Battle Creek Veterans Affairs ("VA") Hospital. Walter Interview Summ., Ex. G to Resp., at 2 (Dkt. 50-8). There is no indication that the student was arrested or that he possessed any items illegally.

After the student was discharged from the VA Hospital, Walter, as head of the Behavioral Assessment Review Team ("BART"), met with the student on campus several times. No Contact Mot. ¶ 4. During the period of time when Walter had his meetings with the student, the student purchased a gun and allegedly said that he wanted to reenlist in the military to "go fight and kill." Id. ¶ 5. The BART Committee also learned that the student might have choked his roommate to the point of unconsciousness. Dr. Kassab Interview Summ., Ex. I to Resp., at 3 (Dkt. 50-10). There is some indication that the student was in a romantic relationship with his roommate, who had been trying to

end their relationship. See Officer Wells Interview, Ex. B to Resp, at 2 (Dkt. 50-3). Additionally, the student reported to the BART Committee that his grandmother had recently died and that he was having suicidal ideations. Walter Interview, Ex. G to Resp., at 3. The student released his VA records to the BART Committee, which, in the psychiatric portion of its report, indicated that the student was not a threat to himself or others. Id.

In order to preserve the possibility that the student could return to OCC the following semester, Walter contacted the student's instructors and asked them to give the student "incompletes" for his current classes. No Contact Mot. ¶ 6. The instructors issued incompletes for the student, but OCC reversed those decisions, expelled the student, and terminated Walter. Termination Letter, Ex. 4 to No Contact Mot. (Dkt. 41-5).

Walter subsequently filed the present case, alleging that OCC retaliated against him because he advocated on behalf of the student. Walter alleged that he attended several meetings with respect to his handling of the situation. Compl. ¶¶ 73-76. After one such meeting, Walter says that Husband, general counsel to OCC, called him seeking further information about the BART Committee. Id. ¶ 77. Walter alleges that unbeknownst to him, the interim vice chancellor of student affairs and the vice chancellor of legal services were also on the call. Id. ¶ 78. He says that at some point, the vice chancellors began yelling at him on the phone call. Id. ¶¶ 79-86. In his motion, Walter alleges that after the phone call, he called Husband directly to complain about retaliatory harassment by the vice chancellors. Resp. at 5. Walter made a similar allegation in his complaint, but he did not name Husband as the person to whom he made his complaint. Id. ¶ 87. Walter also alleges that Husband made independent inquiries into the event with the student in her role as a corporate officer, as opposed to her role as general counsel for OCC. Resp. at 5. In its answer, OCC denied Walter's allegations as

3

untrue, Answer ¶¶ 73-87, and it disputes Walter's characterization of Husband's involvement in the student incident, Reply at 3-8.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 26 allows for broad discovery in litigation, including "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). When ruling on discovery-related motions, the district court has broad discretion to determine the proper scope of discovery, including whether a "discovery request is too broad and oppressive." Surles ex rel. Johnson v. Greyhound Lines, Inc., 474 F.3d 288, 305 (6th Cir. 2007); Lewis v. ACB Bus. Serv., Inc., 135 F.3d 389, 402 (6th Cir. 1998). However, a court, for good cause shown, can issue an order to protect "a party or person from annoyance, embarrassment, oppression, or undue burden or expense" of a deposition. Fed. R. Civ. P. 26(c). "To show good cause, a movant for a protective order must articulate specific facts showing clearly defined and serious injury resulting from the discovery sought and cannot rely on mere conclusory statements." Nix v. Sword, 11 F. App'x 498, 500 (6th Cir. 2001) (internal marks and citations omitted).

## III. DISCUSSION

OCC has not shown good cause for a protective order preventing Walter from contacting the former OCC student or for precluding Husband's deposition. The motions will be taken in turn.

### A. OCC's No Contact Motion

OCC argues that there is good cause to issue a protective order preventing any contact with the expelled student, because it believes that any contact places an undue burden on OCC in the form of a potential "shooter situation on campus." Mot. at 5. Walter argues that the student never posed a threat to anyone other than himself, and that OCC's speculation to the contrary is not supported by the record.

4

Resp. at 17-20. The parties do not dispute that the expelled student has relevant information to Walter's claims against OCC, and they do not dispute that provoking a potential active shooter would place an undue burden on OCC. Therefore, the issue is whether the expelled student presents a current threat of violence to OCC in some fashion. Walter has the better part of the argument in this regard.

The parties dispute whether the student was a threat to other OCC students in 2018. However, whether the student was potentially dangerous more than two years ago is a poor indicator of whether the student is dangerous now, or whether a deposition would trigger the student to commit violent acts. The record reflects that the student had a number of stressors in his life in 2018, e.g., the recent death of his grandmother, conflict with his roommate, and suicidal ideations. There is no current information about the student. OCC's argument is based entirely on speculation about the student's current mental state. Speculation that the student may be prompted to violent action by being contacted in relation to this case fails to constitute good cause for a protective order. Therefore, OCC's No Contact Motion is denied.

### B. OCC's No Deposition Motion

OCC seeks to prevent attorney Eileen Husband, general counsel to OCC, from being deposed in this matter. Mot. ¶ 13. It speculates that Walter is seeking Husband's deposition in order to gain access to privileged communications. Mot. at 2. Walter argues that Husband's deposition is necessary in this case. He represents that he is not seeking protected information, and in the event defense counsel believes that Husband's deposition raises privileged information, they can assert the appropriate privilege. Resp. at 2. Husband's deposition is warranted.

OCC does not argue that Husband is per se immune from being deposed, but rather that Walter has failed to demonstrate that he has satisfied the so-called Shelton test, adopted by the Sixth Circuit in Nationwide Mut. Ins. Co. v. Home Ins. Co., 278 F.3d 621 (6th Cir. 2002), for determining when it

is appropriate to depose opposing counsel. In <u>Shelton</u>, the plaintiff deposed in-house counsel for defendant about the existence of certain contested documents. <u>Shelton v. Am. Motors Corp.</u>, 805 F.2d 1323, 1325 (8th Cir. 1986). On appeal, the Eighth Circuit considered under what circumstances it is appropriate to depose opposing counsel. <u>Id.</u> at 1326. The court ruled that discovery from opposing counsel is allowed, but only upon a showing that "(1) no other means exist to obtain the information . . . ; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." <u>Id.</u> at 1327.

Walter argues that he has satisfied all three elements. Resp. at 15-19. He says that there is no other means to verify certain allegations, for example, Walter's assertion that he lodged a formal retaliation complaint with Husband. Resp. at 15. Walter argues that his complaint to Husband as well as Husband's participation on the phone call with the vice chancellors are relevant, non-privileged information supporting his case. <u>Id.</u> at 16-17. And Walter argues that the information he seeks from Husband is crucial to his defense, because Husband allegedly observed what Walter characterizes as harassment by the vice chancellors and she received Walter's complaint of retaliation. <u>Id.</u> at 18-19. OCC does not make an argument with respect to the first two <u>Shelton</u> factors. OCC focuses on the third factor by arguing that the information Walter seeks is of "overwhelmingly trivial quality." Reply at 9. The Court disagrees.

Whether OCC retaliated against Walter is the crux of this case. OCC represents that no retaliation occurred, and it made blanket denials of most of Walter's allegations in the complaint. At the very least, whether Walter lodged a formal complaint with Husband at the time that he believes retaliatory harassment occurred, is crucial to his case. Without Husband's testimony on the matter, OCC can argue on a summary judgment motion, or to a jury, that Walter is no more than a disgruntled former employee who did not raise the issue of retaliation until after he was terminated. Being able to

refute such an argument could very well be a dispositive issue. Walter has satisfied the third <u>Shelton</u> factor by showing Husband has information that is crucial to preparing his case.

As to issues of attorney-client privilege, it is not clear that it will become an issue. OCC fears that certain lines of inquiry will necessarily implicate the attorney-client privilege. However, thus far, no privilege has been asserted. And Walter represents that he has no intention of pursuing privileged information. The Court declines to make any ruling with respect to attorney-client privilege at the outset of a deposition. Should a dispute over the assertion of a privilege arise during the deposition that the parties cannot resolve, the Court will be in a better position to resolve the issue once the privilege has been asserted and in a specific context.

Walter has made the necessary showing under the <u>Shelton</u> factors, and OCC has failed to show good cause to preclude Husband's deposition. Therefore, the motion is denied.

### IV. CONCLUSION

For the reasons stated above, OCC's motion for a protective order preventing any contact with a non-party witness (Dkt. 41) and motion for protective order precluding Eileen Husband's deposition (Dkt. 48) are denied.

SO ORDERED.

Dated: November 5, 2020　　　　　　　　　　s/Mark A. Goldsmith
　　　　Detroit, Michigan　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　　United States District Judge